## Case No. 17,306.

### The W. D. B.

[Hask. 236.] [1]

### District Court, D. Maine. Oct., 1869.

SALVAGE—COMPENSATION IN CASES OF DERELICT—PURCHASE OF SALVOR'S CLAIM BY OWNER'S AGENT—SALVAGE SERVICES—CONTRACTS—TOWAGE CONTRACTS.

1. Salvage amounting to $850, or one half of the gross amount received from the sale of the property saved, is considered a reasonable award for salvage service rendered in bringing a wreck into port, found derelict in pleasant weather, not far from the coast, and in the accustomed track of coasters and fishermen.

---

1 [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

2. The agent of the owners of the lost property, having purchased the claim of part of the salvors, is allowed from the sum awarded as salvage, the amount that he paid for the claim and no more. The law does not allow an agent to speculate on the misfortunes of his principal.

3. Services, performed in righting a wreck after it is saved from immediate danger and has reached a port of safety, are not properly salvage service, and should be paid for on the basis of labor performed and services rendered; but a contract, made between the salvors and the persons furnishing such service, should be regarded, if reasonable.

[Cited in The Clotilda, Case No. 2,903.]

4. The same rule applies to towage service rendered under like circumstances.

5. Contracts for towage, made between masters of tugs and persons in charge of a wreck, should be scrutinized by courts of admiralty, and annulled if it appears that undue advantage was taken of the necessities of the persons in charge of the wreck to procure unreasonable recompense.

6. The full sum fixed by the contract for towage service will not be allowed, but only a quantum meruit. if it appears that the service did not accomplish the result agreed to be performed.

7. Taxable costs and expenses are ordered paid from claimant's moiety of gross sales.

In admiralty. Libel in rem for salvage service in saving a wreck.

The owners appeared and claimed their property, and by answer disputed the amount claimed in the libel.

Thomas B. Reed, for libellants.

Almon A. Strout and George F. Shepley, for claimants.

FOX, District Judge. This schooner, belonging to St. John, N. B., was dismasted and capsized in the gale of Sept. 8th, off the coast of Maine, whilst on her voyage from Boston to this port, and all hands were lost. On the morning of September 11th, the wreck was discovered by the crew of the fishing schooner, Mary A. Downes, about twelve miles southeast from Wood Island, bottom up, with no one on board. The M. A. Downes was twelve tons burthen, with a crew of four men and two boys. They boarded the wreck and undertook to tow her into Wood Island, for this purpose fastening ropes around her keel by driving through them spikes into the keel and planking, and hitching their cable through these ropes, thus secured to the wreck. After they had thus worked for about two hours, the schooner Winfield Scott, a fishing vessel of about seventy tons, with a crew of twelve men, came alongside and offered her assistance in towing the wreck, which was at once accepted. A hawser was taken to the Winfield Scott, and both vessels had been employed in towing about twenty-four hours, bringing the wreck within two or three miles of Wood Island, when the steam tug Uncle Sam, Willard, master, came up and proposed to tow the wreck into Portland harbor. Some discussion arose as to the price to be paid to the tug. the skippers not being willing to pay more than two hundred and fifty dollars, but the captain of

the tug insisted on three hundred, and this amount was finally agreed upon, and a written agreement was signed on board the tug by which Willard undertook to tow the wreck to Portland for that amount. The Uncle Sam, together with a smaller tug, then attempted to tow the wreck to Portland, about twenty-four miles distant. There was some sea on, but the weather was pleasant, and so continued for a number of days. Finding the tugs were able to make but little progress on account of the chains, spars and rigging, dragging badly under the wreck, Willard agreed with the skipper of the Mary A. Downes to take the wreck into Wood Island, which was accomplished in a few hours. The tugs then attempted to right the wreck, but did not succeed, and returned to Portland, leaving the wreck in charge of the fishing schooners, with the understanding that whenever they should get her righted, the tugs would come out and tow her round to Portland.

Two large broad sloops engaged in carrying stone to the Saco breakwater, furnished with strong derricks and steam windlasses, were afterwards employed in an attempt to turn over the hull, payment being dependent on success. They, however, failed in the attempt, breaking one of their derricks, and thereby destroying a dory belonging to the M. A. Downes.

The Winfield Scott, after remaining four days at Wood Island, proceeded on her fishing voyage, leaving the wreck at anchor in charge of the M. A. Downes, and a few days afterwards, all claim for salvage in behalf of the Winfield Scott and her crew was assigned to David Boyd, Charles H. Chase, and W. Willard, for one hundred and fifty dollars, Willard being the master of the tug, and Chase, one of the firm of Chase & Littlejohn, who were the agents for the owners of the wreck. The purchase of the Winfield Scott's claim was made without objection from the owners, or agent of the insurance company in which the vessel was insured, and who were aware of the arrangement before it was completed. Chase and Boyd then chartered the schooner Nellie Chase to go round to Wood Island and assist in righting the wreck, agreeing to pay her thirty-five dollars per day for three days, certain, and twenty-five dollars per day, so long as she might be engaged beyond the three days. Boyd, a rigger and man of experience in such business, went on board the Nellie Chase on Thursday morning, September 23d, with five men and proper tackles and purchases. They left Portland about seven in the morning, were towed out to Wood Island by the Uncle Sam, turned the wreck over in a few hours, and the same day it was towed round into Portland Harbor together with the Nellie Chase and M. A. Downes, arriving about midnight. The crew of the M. A. Downes remained in charge of the wreck until its arrival in Portland, and rendered all the aid and assistance in their power whilst in charge of the property.

A libel was filed by the Mary A. Downes for salvage. The owners and crew of the Winfield Scott, by Boyd and others, also intervened by petition, claiming to be made parties as salvors. Chase & Boyd have also filed a supplementary petition for an allowance of the expenses of the Nellie Chase, for Boyd's services at Wood Island, and also, for certain expenses paid by Chase for watchmen, &c.

The wreck and materials have been sold under an interlocutory order of sale, and the gross amount realized is $1,702.00.

This vessel was clearly derelict at the time she was discovered by the Mary A. Downes. She was then drifting on the high seas, more than a dozen miles from land, with no one on board, her crew having all perished in the gale three days previously, one of her owners, the master, having been lost, and the others, resident in New Brunswick, being entirely ignorant of the disaster and of the situation and condition of their property. Under these circumstances, the aid and assistance rendered by the two fishing vessels in towing the wreck for twenty-four hours towards the coast, and afterwards employing the steam tug in bringing the vessel into a place of safety, were clearly of a salvage nature, and justified them in standing before the court as claimants for a reasonable salvage, for the benefits thus conferred, by their exertions, upon the owners of the property thus saved. As is very clearly stated by Judge Ware in the case of The Emblem [Case No. 4,434]: "By the common law, the finder of property, which has been casually lost, has no legal claim against the owner to anything in the nature of a reward or compensation for finding. All that he can pretend to is the re-payment of the actual expenses he has incurred in preserving it, and upon the payment of this, the owner is entitled to receive his property free from all other charge. * * * The maritime law, from considerations of public policy, has established a different rule for goods which are lost at sea. A person, who preserves goods which are lost, or in danger of being lost, by the fortunes of the sea, is entitled to a reward for that service. * * * By saving them, he acquires a sort of proprietary interest in the goods, a jus in re, and a complete possessory right against all persons claiming an interest in them, to retain them until his compensation is paid, or until he can proceed to enforce his right against them by due course of law. * * * The right of dominion, or the absolute property, in the meantime remains in the original owner. But he is under no obligation to assert his right by intervening with a claim. He may abandon his property if he pleases, and if he does so, and declines to make himself a party to the suit, no decree can be made against him."

The great learning and experience of Judge Ware, in matters of admiralty, must always commend his decrees, in cases of this nature, to the favorable consideration and approval of all who may be called to act upon similar

causes, and I have, therefore, carefully examined all the decisions of this learned judge in salvage cases which are to be found in the reports, that I might ascertain what amounts he was accustomed to allow in such cases.

In the case of The Elizabeth and Jane [Case No. 4,356] a brig found derelict, about twenty leagues from Seguin with foremast gone, mainmast half cut off, sails and rigging in a ruinous condition, and filled with water that was towed by the salvors, after four days' labor, into Harpswell, the court, in 1823, recognized the general rule of a moiety being awarded in cases of derelict, admitting it as in force as a general guide of judicial discretion, yielding to the reason and equity of particular cases, held that if the salvors claim a larger share, it belongs to them to extract the case from the rule and show that a larger share ought to be allowed. In that case, a moiety of the gross amount of sales, viz., $1,308, was allowed for salvage.

The case of The Bee [Case No. 1,219] was decided in 1836. She had been thrown on her beam ends, lost both masts, and drifted into Bradford's Cove on Grand Menan, where she came to anchor; the next day, November 13th, the crew left her with one anchor down and chain not secured, and went ashore for assistance, the wind at that time blowing a gale directly on shore, and the vessel exposed to its full force and drifting towards the rocks. The libellants heard the story of the crew as to the condition of the vessel, and went on board and took possession. The crew afterwards came out of the woods, down to the shore, with the intention of returning to the vessel. The salvors retained possession, rigged jury-masts, procured some small sails and got her into Lubec on the 17th. In that case the value of the property saved was about $2,000 and Judge Ware allowed $350 salvage.

In 1837 the Rising Sun [Case No. 11,858] was found by a fishing vessel about twenty miles south of Cape Sable, deserted by her crew, on her beam ends, full of water, and was towed by the salvors into Penobscot river. The value of the property saved was $536. Three-fifths of this was allowed as salvage, the value of the salvor ship being $2,000, besides her cargo of fish.

In his opinion in that case, Judge Ware says: "The rule seems formerly to have been considered imperative to allow a moiety in all cases without distinction. But in modern times the rule is not considered as inflexible. Sometimes, though rarely, more is given, and sometimes less, having a just regard to the circumstances of each case, to the risk, the labor, the amount of property saved, and the value of that put at hazard by the salvor's service."

The Amethyst [Case No. 330] was decided in 1839. It appeared that vessel was capsized and her crew taken off, and four days afterwards, she was fallen in with fifteen or twenty miles south-east of Monhegan by three fishing vessels belonging to Boothbay, who towed her the next day near to Boothbay harbor; but be-

fore she arrived within that harbor a storm arose, the cables parted from the wreck, and she was driven on to a reef. Next day there was a heavy sea, and the labor of saving the property was severe, attended with danger to life in getting the cargo from the wreck, and it was necessary to guard it after it was landed to protect it from plunder. The value saved amounted to only $841. The court allowed the three fishing vessels $400 salvage, leaving cost and expenses a charge on the residue.

In the case of The Emblem [supra] (1840) the whole amount of property saved which was liable to salvage was $600. There were taken from the wreck, at the same time by the salvors, bills of exchange and drafts to the amount of $8,000, belonging to the same persons who owned the other property; but upon these the court did not consider that salvage could be allowed. A number of persons were rescued from the wreck, so enfeebled by their suffering, as to be entirely helpless. A salvage of $380 was allowed.

There are other decisions of Judge Ware not reported, but within the recollection of the court, and such as The Goods Saved from the Bohemian, in 1864, and the case of The Mary A. Howes [Case No. 9,193], a fishing vessel that had been boarded by the rebel privateer Tacony, her crew taken off, and the vessel partially dismantled and set on fire, and afterwards found by the libellants and taken into Boothbay. In all of these cases a moiety was allowed for salvage. On a careful examination of his decrees, I am confirmed in the opinion, that under ordinary circumstances in cases of a derelict, where the amount saved was neither very large nor very small, it has been usual and customary in this district, to allow a moiety, or about that proportion of the property as salvage. In 1865, Judge Benedict, in case of The Charles Henry [Id. 2,617,] acted upon this rule, stating that the burden was on the claimant to show that a different measure should be applied if he wished it reduced.

The circumstances of the present case do not suggest any valid reasons for any departure from this proposition. The wreck was found in pleasant weather, at not a great distance from the coast, and in a position where from the large number of coasters and fishing vessels which abound in this vicinity, in all probability she would have been picked up by some other vessel if the libellants had not discovered her. The value of the property at risk in effecting the salvage was not very large, both vessels probably not being worth much, if any, over $4,000. The risk to life and property in the service was very slight, and the labor of towage was quite moderate and but for a short period: no particular skill was either requisite or manifested; and under all the circumstances of the case, I am of opinion that $850, being a moiety of the gross amount of sales, is a reasonable award and compensation for the services rendered to the owners of this property in saving it: for it should ever be remembered by the court, if not by the salvors, that

the property, although wrecked, still belongs to its original owners, and that salvage is only a reasonable and proper compensation, to be awarded out of the property itself, for the benefit conferred upon the owner by bringing it to a place of safety and restoring it to him. The apportionment of this amount among the respective parties is not without difficulty.

The claim of the Winfield Scott has been transferred for the sum of $150 to Chase and others, and as all parties, both salvors and purchasers, by the purchase have demonstrated that they considered that amount a fair remuneration for the services rendered by that vessel, I am inclined to adopt their conclusions and not to increase the amount. The wreck at the time of this purchase was at Wood Island, comparatively in a place of safety, and the salvors were well aware of the services they had rendered, and what they should receive in satisfaction therefor. The purchasers of this claim, one of whom was then acting as agent for the owners of the vessel, certainly should not ask for anything beyond an indemnity and return to them of the amount thus advanced in defraying the charges and claims on the property of the principal, whose interests this agent was bound to guard and protect; for the law will not permit an agent to speculate on the misfortunes of his principal, or to hold any profits incidentally obtained in the execution of his duty. From the evidence before me, I have no reason to suppose that Capt. Chase had any such motive or purpose, but giving him full credit for his statement, that he purchased this claim in order to control the wreck for the owner's benefit, and that he was influenced solely by what he believed to be for their advantage, and had no intention personally to gain any profit or advantage thereby, most praiseworthy and honorable motives, which should actuate every honest agent whilst in the discharge of the duties of his agency, I can have no doubt that it will be entirely satisfactory to him and his co-purchasers, if I award for their benefit on the libel in behalf of the Winfield Scott, the sum of $150, the claimants not having raised an objection, which might have been presented, founded on the transfer of the claim to these parties.

The petition of Boyd and Chase is for the payment of certain expenditures incurred by them, and for Boyd's services about the vessel after their purchase of the W. Scott's claim. These services, as I think, are to be considered, not as absolute salvage services, but rather as claims for work and labor done upon the property after it had been saved from immediate danger and had reached a port of safety.

The Nellie Chase was chartered by the petitioners to go to Wood Island and assist in righting the vessel, and they agreed to pay her thirty-five dollars per day for three days absolutely, and twenty-five dollars per day for the time she might be further employed. They left here about seven o'clock in the morning, were towed to Wood Island by the tug, and returned about midnight the same night with the wreck, having been actually employed short of twenty hours, but if the bargain was a fair and reasonable one, upon which point there is nothing to discredit it, the owners of the Nellie Chase are entitled to receive their three days' pay, although they have been deprived of their vessel but a single day, and they have had the use of her for the two days for which they thus will receive compensation from the petitioners. It would have been more satisfactory to the court, if the contract had been to pay a reasonable amount for the time to be actually employed; but as it appears to have been difficult to obtain a vessel, and it is not shown that one could have been obtained on any other terms, I will allow the charge of $105 on account of the Nellie Chase. Another claim made on account of this schooner is for a hawser, which is said to have been chafed and parted in towing the wreck, or as is set forth in the bill of items, "spoiled in righting and towing schooner." This charge is one which I should not certainly allow to its full extent. The schooner was hired for the purpose of righting the wreck, was to be towed out and back, of course in connection with the wreck, if the undertaking should prove a success; all the spars, rigging, hawsers and other appurtenances of the schooner were to be used in any way which was reasonable and proper, and if whilst thus used, they should be injured, I apprehend the damage should be borne by the schooner, and not by those who have hired her for this employment. It certainly must have been well understood, that the work about which she was to be employed, was something unusual and would make somewhat severe demands upon the vessel, her rigging and other appurtenances in accomplishing the business she had undertaken; her spars, ropes and hawsers would necessarily be required to withstand heavy strains and great force; they were hired for this very purpose as a part of the vessel, and the damage to them, if any, should not be charged to the hirers, especially when we consider the large amount to be paid for one day's employment of the vessel. It is said, the hawser was broken and chafed whilst in use as a tow-line from the tug to the wreck; if so, the tug may be accountable, as she should have been provided with proper towlines; if she was deficient, and obtained the hawser from the schooner which was in charge of her master, it is a matter solely between the tug and schooner as to the damage done by the tug to a hawser for which the charterers of the schooner can in no way be held responsible.

Boyd went in the Nellie Chase, taking with him five of his men, and his tackles and purchases sufficient to right the wreck. His claim is one hundred twenty-five dollars for this day's work. He ordinarily charges

three dollars and a half a day for his men, and the use of his blocks and purchases, he states would be worth ten dollars. Chase claims twenty-eight dollars paid for watching the property after it was brought to Portland, and before it was taken possession of by the marshal. He also presents another bill for horse hire, services of Capt. Shannon, and telegraph charges, amounting in all to thirty-four dollars and forty-six cents, no part of which, as I think, can properly be allowed in the present suit, as they are charges to be borne by the owners, without regard to any salvage services. Upon the best consideration which I can give to the claim presented by Boyd & Chase, for their own charges and the bills of the Nellie Chase, I shall award and allow them the sum of $225.

The only remaining claim is that of the original salvor, the Mary A. Downes, and this includes the amount properly chargeable for towage by the steam tugs. It appears that the two small fishing vessels had succeeded in towing the wreck in her then condition about ten miles, and as the weather then was and continued for some days, I have no doubt they would with perseverance have succeeded in getting it into Wood Island, if they had chosen so to do; still it was quite proper for them to obtain the assistance of the tugs, at a reasonable price, and the court will always be quite ready to sustain any agreement for towage for wrecks, which under the circumstances may be fair and just. In the present case, the agreement, as made, was to tow this wreck as it then was, bottom upwards, into this port for three hundred dollars. Willard, the master of the tug, has been for many years engaged in this business, saw the condition of the wreck, and must have been aware of the slow progress of the schooners in towing it, and he demanded a very considerable sum for taking it to Portland, and more than the skippers of the fishing vessels thought reasonable; but situated as they were, they finally agreed to pay this amount for this particular service, and the court would probably have allowed that sum, if the tug had performed her part of the contract, which it must be remembered was to take the wreck into Portland, as it then was, and not as it might afterwards be, when righted at the expense of the salvors, and so placed as to be towed there in a third of the time it would have taken, in the condition the wreck was when the bargain was made.

I deem it not improper to suggest in relation to these contracts for towage entered into by the masters of the tugs with those in charge of wrecked property, that a court of admiralty is inclined to scrutinize such bargains with considerable care, and before they will be sustained and enforced, the court must be satisfied that the master of the tug has not taken advantage of his position to make an unreasonable bargain, and insist on an exorbitant recompense.

Mr. Justice Story in The Emulous [Case No. 4,480], says, "It is true, that contracts made for salvage services are not ordinarily held obligatory by the court of admiralty upon the persons whose property is saved, unless the court can clearly see that no advantage is taken of the parties' situation, and that the rate of compensation is just and reasonable. The doctrine is founded upon principles of sound public policy, as well as upon just views of moral obligation. No system of jurisprudence purporting to be founded upon moral, or religious, or even rational principles, could tolerate for a moment the doctrine, that a salvor might avail himself of the calamities of others to force upon them a contract unjust, oppressive, and exorbitant, that he might turn the price of safety into the price of ruin; that he might turn an act demanded by Christian and public duty into a traffic of profit, which would outrage human feelings and disgrace human justice." These remarks are quite applicable to salvage services by towage, and whenever such a contract is produced, and a much larger compensation is found to have been agreed upon than is ordinarily claimed for towage services, the court will not feel obliged to allow such exorbitant sums, although the party may have signed an agreement to pay the amount. In most cases it will probably be better for all concerned that the towage services of wrecks should be rendered without any special agreement as to the rate of compensation, leaving this to be determined afterwards, when both parties are on shore on an equality, by the parties themselves, or by the court in case of disagreement.

Admitting, for the purposes of this decision, that three hundred dollars would not have been an exorbitant amount for towing the wreck, as she then was, into Portland, and that the bargain was fair and just and obligatory on both sides, it is quite manifest that the tug has not performed her part of it, because after a very short attempt at towing the wreck, the captain of the tug declared that he could not accomplish it, and thereupon, as he says, obtained the consent of the skipper of the M. A. Downes, that he should take the wreck into Wood Island, and come out and take it round to Portland when righted. This proposition was assented to, but it does not appear that the skipper agreed to pay the amount of three hundred dollars for this service, which could be much more expeditiously and easily accomplished when the wreck should be upon an even keel. I am not at all convinced that the tugs could not have taken the wreck into Portland harbor as she then was. They were certainly much more powerful than these fishing vessels, and, although it might have probably taken the tugs somewhat longer than was desirable, I

believe they would have succeeded in getting the wreck into Portland harbor without any great risk to the property, and that the hull could have been righted for less than half the expense it cost at Wood Island, provided the tugs had performed their part of the contract, and brought the wreck in here as it was stipulated they should do. Not having done so, the skippers of the fishing vessels are not legally bound to pay the master of the tugs the stipulated amount, but he is only entitled to claim a just and fair compensation for what he has done. I have hesitated, between $200 and $250, but on the whole, considering that on the first day some assistance was rendered by the tugs, and that afterwards the Uncle Sam was employed for one day about the wreck, I have decided to allow the M. A. Downes the sum of $250 for the tugs' services, which is certainly full and liberal compensation for all the aid rendered by them at any time. A balance of $225 remains of the moiety allowed for salvage. This sum is somewhat in excess of the amount allowed the Winfield Scott, but the ropes and hawsers of the Mary A. Downes were badly injured in towing the wreck, and her dory destroyed. These damages, being sustained when the vessel was not employed under any contract, but whilst in discharge of her duties as salvor, I think, may properly be considered by the court in the estimate of the salvage to be allowed. This schooner was much smaller than the Winfield Scott, and had but half as many men, but she remained in charge of the wreck until it was brought round to Portland, and assisted in the various attempts at righting it, and under all the circumstances, I shall award the $225 to the Mary A. Downes, together with $250 to remain in the registry for the present, and to be paid to the master of the steam tugs upon his filing a discharge of all claim for services in this behalf.

The taxable costs and expenses are to be paid from the remaining moiety of the gross sales in the registry. Decree accordingly.